UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x

ANGEL CHAVONNE MCMILLAN,

                                      **COMPLAINT**

                    Plaintiff,

              -against-

CITY OF NEW YORK; AMANDA JIMENEZ (Shield No.
1301/097 Command); SAMUEL SURLES (shield no. unknown);   Jury Trial Demanded
MARCIA JONES (shield no. unknown); and JOHN and JANE
DOE 1 through 9, individually and in their official
capacities (the names John and Jane Doe being fictitious,
as the true names are presently unknown),

                         Defendants.
---------------------------------------------------------------- x

      Plaintiff, ANGEL CHAVONNE McMILLAN, by and through her undersigned counsel,

THE CAMPBELL FIRM PLLC, as and for her Complaint against CITY OF NEW YORK;

AMANDA JIMENEZ (Shield No. 1301/097 Command); SAMUEL SURLES (shield no.

unknown); MARCIA JONES (shield no. unknown); and JOHN and JANE DOE 1 through 9,

individually and in their official capacities (the names John and Jane Doe being fictitious, as the

true names are presently unknown), hereby alleges as follows:

### PRELIMINARY STATEMENT

      1.    Angel Chavonne McMillan ("plaintiff" or "Ms. McMillan") is an individual with

multiple disabilities and medical and psychological conditions, whose primary and preferred

means of mobility for the last several years has been a manually operated wheelchair.  Ms.

McMillan was falsely arrested by the New York City Department of Homeless Services Police

("DHS Police") (affiliated with the New York City Department of Homeless Services ("DHS"))

and/or the New York City Police Department ("NYPD") on August 19, 2019.  The top charge was

only a misdemeanor, and ultimately all charges against Ms. McMillan were dismissed.  From arrest to arraignment, she was subjected to police brutality through physical beating, tightening of handcuffs to the wrists and ankles and being dragged out of her wheelchair to be tossed into a non-handicap accessible van.  She was humiliated and shamed by being made to stand and walk, putting stress on her weak legs and stress on her mind.  She was traumatized from the brutalization and inhumane treatment she suffered at the hands of the DHS Police officers and/or NYPD officers.

2.     From this victimization, she suffered a series of stress-induced seizures that necessitated her being brought to a hospital.  An officer of the DHS Police or NYPD named Samuel Surles was telling lies about Ms. McMillan's well-documented seizure disorder to other officers and medical professionals – namely, that she was simply faking them just like his grandmother used to do.  He created an atmosphere where other DHS Police officers and/or NYPD officers could have a good laugh at Ms. McMillan's expense.

3.     In fact, during her approximate 25-hour ordeal from arrest to arraignment, each time Ms. McMillan was transported from the hospital to the police precinct, to Central Booking, and then to the Criminal Courthouse on Schermerhorn Street in Brooklyn to be arraigned, she was forced to stand because no handicap-adapted vehicle was provided for her.

4.     Ms. McMillan alleges that both the DHS Police officers and NYPD officers discriminated against her and failed to accommodate her disabilities, leading to the deprivation of the right to be arrested in a non-violent manner and to be transported in a manner consistent with her human dignity and as required by state and federal law.  This traumatic experience caused Ms. McMillan to severe emotional distress.  In addition, her wheelchair was broken during the process.  And during the course of being dragged into the non-wheelchair- accessible law enforcement van, her Summer-accessory flip-flops were lost making an already marginalized homeless person shoeless and dejected.

5.     The City of New York is responsible for the conduct of its agencies.  The agencies' failure to accommodate Ms. McMillan's disabilities represents a continuing violation that has persisted for many years.  There have been one or more lawsuits against the City of New York for such matters, and there was a settlement resulting from a lawsuit by New York Lawyers for the Public Interest ("NYLPI") which was, according to NYLPI's website, explaining this important settlement, supposed to end "dangerous and discriminatory transportation practices for all people in police custody who use wheelchairs."  Pursuant to the settlement, NYPD promised to develop an ADA-compliant policy to transport people who use wheelchairs in accessible vehicles.  On information and belief, a plan was developed but is both not enforced and woefully inadequate.

6.     On information and belief, the City has written policies and procedures that are designed to protect the physical well-being and human dignity of disabled people in relation to their mobility, but systematically, and in this case, intentionally, failed to implement them.

7.     Significantly, the U.S. Department of Justice has guidelines for the treatment of disabled people by law enforcement, and one of the guidelines provides for the safe transport of disabled people, including persons in wheelchairs, in appropriately adapted vehicles.   On information and belief, DHS Police officers and NYPD officers are trained on such guidelines.

8.     On information and belief, John Jay College of Criminal Justice, which is a certified Police Training Academy for the Department of Criminal Justice Services ("DCJS") provides training for all newly-hired and active members of NYPD and DHS Police officers.   On information and belief, DCJS includes training regarding the appropriate transport of persons with disabilities, and yet, the DHS Police officers and NYPD officers involved in the transportation of Ms. McMillan completely ignored what they have been taught.

9.     Plaintiff seeks monetary damages (special, compensatory and punitive) against defendants, as well as an award of attorney's fees for the defendants' violation of her rights secured

by the Civil Rights Act of 1871, 42 U.S.C. §§ 1981 and 1983; by the United States Constitution, including its Fourth and Fourteenth Amendments, and by the laws and Constitution of the State of New York.  The DHS Police officers and the NYPD, acting under color of state law, intentionally and willfully subjected plaintiff to, inter alia, false arrest, false imprisonment, fabrication of evidence, malicious prosecution, excessive use of force and assault.

10.     Further, plaintiff brings this lawsuit to compel the City of New York and its agencies to cease unlawful discriminatory practices and implement policies and procedures that will ensure safe, accessible and humane treatment of people with disabilities so that, even when being arrested, they can have receive all of the opportunities and benefits that a person, who is not disabled would receive and further to provide safe and accessible vehicles and services for arrestees who use wheelchairs.

11.     Plaintiff seeks declaratory and equitable relief, monetary damages and attorneys' fees to redress the unlawful discrimination on the basis of disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq., and its implementing regulation, 28 C.F.R. Part 35; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 791; the New York Human Rights Law ("NYHRL"), N.Y. Exec. L. § 290, et seq.; the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101, et seq.; and other state and common law causes of action.

## PARTIES

12.     Plaintiff ANGEL CHAVONNE McMILLAN ("plaintiff" or "Ms. McMillan") is currently a resident of Queens County in the City and State of New York.  At the time of the events described herein, plaintiff was a resident of Kings County in the City and State of New York.  Ms. McMillan is a qualified person with a disability within the meaning of the ADA, the Rehabilitation Act, the NYHRL, and the NYCHRL

4

13.    Defendant CITY OF NEW YORK (sometimes referred to herein as "City") is a municipal corporation organized under the laws of the State of New York.  Its seat of governance was and still is located at City Hall Park, New York, New York.

14.    Defendant the City of New York operates the NEW YORK CITY DEPARTMENT OF HOMELESS SERVICES ("DHS"). the NEW YORK CITY DEPARTMENT OF HOMELESS SERVICE POLICE ("DHS Police") and the NEW YORK CITY POLICE DEPARTMENT ("NYPD"), all of which are located within the City of New York and operate within the five boroughs.  At all times relevant hereto, the City of New York was responsible for enforcing the rules of DHS, DHS Police and NYPD and for ensuring that personnel of those agencies obey the laws of the United States and the State of New York.  By and through its agencies, the City of New York was responsible for the appointment, training, supervision, promotion and discipline of all such agency personnel (which includes supervisory personnel), including the individually named defendants herein.

15.    DHS is a governmental agency of the City of New York, and is therefore a department, agency, special purpose district, or other instrumentality of a local government within the meaning of 42 U.S.C. § 12131(1)(B)

16.    DHS Police, is a municipal police force and/or peace officer force and a governmental agency of the City of New York (affiliated with DHS), and is therefore a department, agency, special purpose district, or other instrumentality of a local government within the meaning of 42 U.S.C. § 12131(1)(B)

17.    NYPD is a municipal police force and a governmental agency of the City of New York, and is therefore a department, agency, special purpose district, or other instrumentality of a local government within the meaning of 42 U.S.C. § 12131(1)(B)

18.   NYPD is responsible for the appointment, training, supervision, promotion and discipline of NYPD officers and supervisory NYPD officers, including the individually named defendants herein who are NYPD officers.

19.   DHS is responsible for the care and safety of homeless persons residing within the New York City shelter system, including Ms. McMillan, who has been living in the City's shelter system for approximately a decade.

20.   DHS, together with DHS Police, are responsible for the appointment, training, supervision, promotion and discipline of DHS Police officers and supervisory DHS Police officers, including the individually named defendants herein who are DHS Police officers.

21.   At all times relevant hereto, AMANDA JIMENEZ (Shield No. 1301 of the 097 Command) (hereinafter referred to as "Officer Jimenez") was an officer of the DHS Police and/or the NYPD, acting in the capacity of agent, servant and employee of Defendant City of New York, and within the scope of her employment as such.  Officer Jimenez signed the document making criminal allegations against Ms. McMillan (the "Charges"), which led to the initiation of the criminal proceedings against Ms. McMillan.  Officer Jimenez is being sued in her individual capacity and in respect of her official capacity as an officer of the DHS Police and/or NYPD.

22.   At all times relevant hereto, SAMUEL SURLES (shield number and command unknown) (hereinafter referred to as "Officer Surles") was an officer of the DHS Police and/or the NYPD, acting in the capacity of agent, servant and employee of Defendant City of New York, and within the scope of his employment as such.  Officer Surles is referred to as an informant, who alleged that Ms. McMillan was in possession of drugs; he further alleged that Ms. McMillan harassed him, as reported by Officer Jimenez in the Charges.  Officer Surles is being sued in his individual capacity and in respect of his official capacity as an officer of the DHS Police and/or NYPD.

23.     At all times relevant hereto, MARCIA JONES (shield number and command unknown) (hereinafter referred to as "Officer Jones") was an officer of the DHS Police and/or the NYPD, acting in the capacity of agent, servant and employee of Defendant City of New York, and within the scope of her employment as such.  Officer Jones is referred to as an informant, who alleged that Ms. McMillan was in possession of drugs; she further alleged that Ms. McMillan harassed her, as reported by Officer Jimenez in the Charges.  Officer Jones is being sued in her individual capacity and in respect of her official capacity as an officer of the DHS Police and/or NYPD.

24.     JOHN AND JANE DOE 1 THROUGH 9 (each referred to as "J. Doe # __") were police officers, detectives or supervisors employed by the DHS Police and/or NYPD.  Plaintiff does not know the full names and/or real names and shield numbers of defendants John and Jane Doe 1 through 9 or has only partial information with respect thereto insufficient to adequately identify such persons at this time.

25.     At all times relevant herein, defendants John and Jane Doe 1 through 9 were acting as agents, servants and employees of defendant City of New York, DHS, DHS Police and/or NYPD.  Defendants John and Jane Doe 1 through 9 are sued in their individual and official capacities.

26.     Upon information and belief, all DHS Police officers and NYPD officers responsible for Ms. McMillan's arrest, transport and/or detention, including Defendant Officers Surles, Officer Jones and Officer Jimenez, were aware of Ms. McMillan's physical, mental and emotional disabilities.

27.     At all times relevant herein, all individual defendants were acting under color of state law.

28.     On information and belief, City of New York is a public entity and it and each of its agencies, DHS, DHS Police and NYPD, are recipients of federal financial assistance, thus making

each entity identified above subject to the requirements of both the ADA and the Rehabilitation Act.

## JURISDICTION AND VENUE

29.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 1343 and 2201; 42 U.S.C. §§ 1983 and 1988; the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States; Title II of the ADA, 42 U.S.C §§ 12131, et seq; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

30.    This Court has supplemental jurisdiction over plaintiff's state and local law claims under 28 U.S.C. § 1367 because the federal and local law claims arise from a common nucleus of operative facts.

31.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events that give rise to the claims occurred in the County of Kings, State of New York, which is within the jurisdiction of this Court.

## JURY DEMAND

32.    Plaintiff demands a trial by jury in this action.

## CONDITIONS PRECEDENT

33.    To the extent required under N.Y. GMU. Law § 50-e, plaintiff filed a timely Notice of Claim against the City of New York in this matter on November 18, 2019, by filing it at the New York City Comptroller's Office.

34.    An examination of Ms. McMillan, pursuant to New York General Municipal Law § 50-h, was held on July 8, 2020.

35.    Pursuant to the requirements of N.Y. C.P.L.R. § 217(a), this Complaint is timely because it was filed within one year and ninety days of the alleged unlawful incidents or is otherwise

timely due to any applicable extensions granted by executive orders issues by the governor of the State of New York in regard to the COVID-19 pandemic.

36.     Therefore, plaintiff has satisfied all conditions precedent to the filing of this Complaint, or to the extent any conditions precedent are not satisfied, they are excused.

## **STATEMENT OF FACTS**

37.     Ms. McMillan is a homeless woman, who is disabled.  She has a well-documented seizure disorder and other mental and physical disabilities.  She is principally dependent on the use of a wheelchair based on the weakness in her legs and balance issues she has.  She has experienced severe trauma in her life and is a survivor of domestic violence.  She has lived in the New York City shelter system for many years.  At the time of the events described herein, she was residing at a shelter located in the County of Kings, State of New York (which will be referred to herein sometimes as the "Shelter").

38.     At or about 11:25 p.m. on August 19, 2019, Ms. McMillan was inside the ladies' bathroom.  Ms. McMillan had been preparing to use the lavatory facilities, when Officer Surles entered the ladies' bathroom with an unknown female officer (believed to be either an NYPD or DHS officer), whom plaintiff has heard referred to as "Bradley", but has no further identifying information at the time of the filing of this Complaint (hereinafter referred to as "J. Doe # 1").  Officer Surles then proceeded to rough-up Ms. McMillan while unlawfully searching her fanny pack.

39.     Officer Surles instructed Ms. McMillan to get out of her wheelchair and stand.  J. Doe # 1 was instructed to cuff Ms. McMillan.  She began placing a handcuff on Ms. McMillan's left wrist.  That handcuff on that wrist was not super-tight.  However, Officer Surles took it upon himself to close the bathroom door and stated to J. Doe # 1 and Officer Jones, who had entered the

bathroom at some point: "I'm gonna show you ladies how to do this."  Officer Surles then put a handcuff on Ms. McMillan's right wrist very tight.

40.    Officer Surles escalated his aggression toward Ms. McMillan.  As she was being further roughed up, Ms. McMillan lost her footing and fell to the floor.  Officer Surles, responded to her multiple cries from the pain she experienced from falling and from the tightness to her wrist from the too-tight handcuff with indifference.

41.    When she fell, Ms. McMillan had several of her fingernails broken.  She had just had a manicure done on August 19, 2019.  It was one of the few luxuries to which this homeless woman treated herself.  While the monetary value of her manicure was only approximately $50.00, the manicure represented much more to Ms. McMillan and was part of how she groomed herself to be presentable, given her physical scars – the most prominent one being right across her forehead; her emotional scars of not feeling pretty enough or good enough to not be physically and emotionally abused in past domestic relationships; and the daily label of "homeless."

42.    Without provocation, Officer Surles began hitting Ms. McMillan, while J. Doe # 1 and Officer Jones looked on, not even attempting to stop him or help Ms. McMillan in any way. First, Officer Surles punched Ms. McMillan in the back of her head while she was face down. Notably, the floor was cold and smelly from urine and garbage on the floor.

43.    Officer Surles then punched Ms. McMillan repeatedly – hard – to the left side of her face, all the while she was still handcuffed behind her back with no way to defend herself from Officer Surles' attack.  Ms. McMillan looked to Officer Jones to help her, calling out to her for her help, but to no avail.

44.     Ms. McMillan was not resisting the arrest that was in progress.  Officer Surles thrust his knee into her back to get her legs handcuffed.

45.    Although there was no probable cause to search her or arrest her, Ms. McMillan was arrested.

46.    On information and belief, additional officers entered the bathroom.  The exact number (estimated to be two) (hereinafter referred to as "J. Doe #2" and "J. Doe # 3", respectively), their names or shield numbers are unknown.  Those officers proceeded to place handcuffs tightly on Ms. McMillan's ankles.

47.    Ms. McMillan suffers from a seizure disorder and takes medication that is normally prescribed for epilepsy.  Stress is a principal trigger of Ms. McMillan's seizures.  Her seizure disorder is well documented in her medical history, along with her mental health conditions, including depression and post-traumatic stress disorder ("PTSD").

48.    That night, Ms. McMillan began to experience multiple seizures as a result of the events taking place in the bathroom and thereafter.  To the extent she can identify when the seizures started that night, it was when Officer Surles first punched her.  Ms. McMillan finds it difficult to remember all the seizures, but at some point, she recalls that emergency medical technicians ("EMTs") entered the bathroom to prepare her for transportation by ambulance to a hospital.

49.    The ambulance arrived, and EMTs put Ms. McMillan on a stretcher straight out of the bathroom, right off of the floor.  She was taken to a hospital in Brooklyn in the early morning hours of August 20, 2019.

50.    Officer Surles and Officer Jones rode in the ambulance also.  While in the ambulance, Ms. McMillan overheard Officer Surles tell Officer Jones that she should claim that her leg hurt and that she should take a few days off of work.

51.    Ms. McMillan was still in handcuffs when she arrived at the hospital.  The handcuffs were removed from her ankles so that the hospital staff could examine her.  A nurse at the hospital noticed the handcuffs on Ms. McMillan's wrists were too tight and asked Officer Surles to loosen

the cuffs. Only then did Officer Surles loosen the wrist cuffs. Then, he removed the left handcuff, but kept the right handcuff attached to the bed.

52.     At one point, Officer Surles stated to the medical professional that Ms. McMillan was not having "real seizures," implying that she fabricated her seizures that evening. This conjecture was an attempt by Officer Surles to interfere in the medical treatment that Ms. McMillan was receiving.

53.     Officer Surles had no right to make false claims to the treating medical professionals, stigmatizing and discriminating against Ms. McMillan, a person suffering from both mental and physical disabilities.

54.     The physician asked Officer Surles whether Ms. McMillan needed a psychiatric evaluation, and he said "no." On information and belief, such statements were relied upon by the medical professionals and interfered with the hospital's treatment plan for Ms. McMillan.

55.     Although the treating professionals offered Ms. McMillan the opportunity to have her blood drawn to see what the level of seizure medication was in her bloodstream, that seemed unnecessary to her. Indeed, she has a prescribing neurologist and knows what medications she takes. Ms. McMillan did not want to be treated with Officer Jones and Officer Surles present, and it seemed that the most the hospital could really offer was for her to wait for several hours to see if she were to have more seizures. She declined further evaluation and treatment at that time. Notably, there was pressure to move Ms. McMillan forward into booking so that she could be arraigned.

56.     On information and belief, another group of four DHS Police or NYPD officers (hereinafter referred to as "J. Doe #4", "J. Doe #5," J. Doe # 6" and "J. Doe #7", respectively) arrived at the hospital to assist Officer Surles and Officer Jones in taking Ms. McMillan to be booked, including to fingerprint Ms. McMillan and take her photograph. In moving Ms. McMillan,

such additional officers wheeled her out of the hospital in the wheelchair that she owns that her health insurance had paid for.

57.    At the point where she was to be placed into the van, Officer Surles instructed Ms. McMillan once again to stand and walk, and while doing so, Ms. McMillan had another seizure right in front of the hospital.

58.    One or more of these four DHS Police officers or NYPD officers said "we should take her back inside," but Officer Surles once again interjected himself and declared that she was not having a "real seizure."   He stated, "All this time, she didn't have another seizure. Now she wants to have another seizure.?! This is fake!"   Officer Surles then referred to his grandmother whom he indicated has seizures that she fakes.

59.    Then, Officer Surles began dragging Ms. McMillan and demanded that J. Doe # 4 assist Officer Surles in dragging Ms. McMillan toward the van.

60.    Ms. McMillan would not have been able to transfer from her wheelchair into the van because the van's door was high up from the ground, and the van did not have a wheelchair accessible entrance.  Ms. McMillan's cries for help went unheeded.  No alternative transportation method was offered to accommodate her disability. Ms. McMillan did not feel comfortable asking for alternative transportation under the circumstances; indeed, there was a lot of pressure to move Ms. McMillan toward booking.

61.    Officer Surles told the other officers to move out of the way.  Acting together and in concert, Officer Surles and such J. Doe # 4 threw her into the van that was neither designed nor retrofit to accommodate wheelchair users.  Among other officers, Officer Jones was a witness to this further physical abuse.  Just as before, she did nothing to stop it.

62.    In the process of being dragged and thrown into the van, Ms. McMillan lost her Summer-accessory flip flops and was shoeless.   The monetary value of her flip flops was

approximately $15.00, but to a homeless woman, her shoes are much more valuable, as she takes pride in how she presents herself, and being shoeless is not her common practice.

63.   J. Doe # 5 was driving and J. Doe # 6 were sitting in the front passenger side in the van.  Also present inside the van were Officer Jones, Officer Surles, J. Doe # 4 and J. Doe #7. There was also another person in handcuffs being transported in the van.

64.   The officers made several jokes about Ms. McMillan's situation, including the "there's no witnesses to make a report" joke.

65.   Plaintiff believes she was transported to the precinct and then to Central Booking in the middle of the night (because it was dark outside). Ms. McMillan reports that she was subjected to a strip-search by an unknown female officer (believed to be either an officer of the DHS Police or NYPD) (hereinafter referred to as "J. Doe #8").  She believes she was fingerprinted and photographed by Officer Surles.  During that time, she was forced to stand again, which is difficult for Ms. McMillan due to her balance problems and weakness in her legs.  She had a very serious seizure in 2018, which rendered her unable to walk normally; hence the need for the wheelchair.

66.   There were several times during the time she was in custody where her handcuffs were put on and taken off.  Each time that Officer Surles had the opportunity to put them on Ms. McMillan, he tightened them so that Ms. McMillan experienced pain.

67.   Although not Ms. McMillan's first arrest, Ms. McMillan had never been charged with drug possession before, and this was shocking to her.

68.   Ms. McMillan was not read her Miranda rights.

69.   Ms. McMillan was not offered anything to eat or drink by any of the officers or court personnel.  She was only able to get something to eat after the arraignment.

70.   Before Ms. McMillan left the Shelter, she requested that she be given her medication, which she is required to take twice a day for her seizure disorder.  Her medication was left behind at

14

the Shelter because the DHS Police officers and/or NYPD officers did not allow her to take her medication with her.  An unknown individual, believed to be a DHS Police officer or NYPD officer (hereinafter referred to as "J. Doe # 9"), told Ms. McMillan that she could go 72 hours without her medication, but on information and belief, such person is not a pharmacist, physician or other medical professional capable of making such a determination.

71.    Missing doses could be dangerous for Ms. McMillan, putting her at risk of medical complications.  Not being able to take her medication with her further traumatized her because the reason she is in a wheelchair now is because a prior shelter in which she was residing locked her out of the shelter for being delayed in returning to that shelter and kept her medication so that she could not access it.  As a result thereof, she suffered such a severe seizure that she had to be hospitalized and had such weakness in her legs and balance issues that her treating doctor prescribed the wheelchair.

72.    Ms. McMillan was also deprived of the right to make any phone calls during this marathon ordeal.  She was unable to take her cell phone with her or otherwise make a phone call at the hospital, the precinct, Central Booking or at her last stop – the Criminal Courthouse.

73.    Eventually, Ms. McMillan was to be transported to the Criminal Courthouse for arraignment.  It was morning by then; she noticed the sun was coming up.  Ms. McMillan was then taken to a van for transport to the Criminal Courthouse at 120 Schermerhorn Street in Brooklyn, New York.  Officer Surles instructed her to stand up to avoid "what happened last night."   Not wanting to be dragged into the non-handicap accessible van, she forced herself to stand and get into the van.

74.    Officer Surles was rough with Ms. McMillan's wheelchair and cursing about how it "gets on my nerves."  When the wheelchair was returned to Ms. McMillan, it was broken.  It no longer would fold and unfold properly.  It was not damaged prior to Officer Surles handling it.  On

information and belief, Officer Surles broke Ms. McMillan's wheelchair. The value of her wheelchair is approximately $250.00. She relies on a wheelchair to move herself about both indoors and outside. Trying to use a broken wheelchair was frustrating and caused damage to Ms. McMillan, as it reminded her of the experiences described in this Complaint.

75.   None of the vehicles (believed to be operated by DHS Police or NYPD) used to transport Ms. McMillan from the hospital to the precinct; from the precinct to Central Booking; and from Central Booking to the Courthouse were handicap-accessible. At no time was Ms. McMillan provided with the opportunity to be transported by an appropriate means of transportation, consistent with her special needs.

76.   As a person who regularly uses Access-a-Ride and New York City bus services, which are specially equipped with wheelchair lifts, such means of transportation is her preferred means of transportation and appropriate for someone in Ms. McMillan's condition, unlike the vans in question here.

77.   Indeed, throughout the process of arrest, booking, transport, detention in the precinct, Central Booking and courthouse, she was not provided use of her wheelchair after it was broken. She was forced to walk, stand and maneuver, including to go to the bathroom without the benefit of any handicap-accessible bathroom. Indeed, not having the ability to use a grab bar to stabilize herself, she had to balance as best as she could against the bathroom walls.

78.   The failure of the DHS Police and NYPD to provide her with appropriate accommodations for her disability led to her being dragged into one vehicle and having to struggle to hike herself up into the others. In the process of transporting her, she was physically injured, became shoeless and had her wheelchair broken. She also was not strapped in, and while handcuffed, bounced around in the vehicles – none of which were handicap accessible, putting further pressure on her body, including pressure on her handcuffed limbs. She suffered physical

damage, as well as extreme stress and psychological damage, as a result of the misconduct of the DHS Police officers and/or NYPD officers.

79.    On information and belief, the City of New York is well aware of its obligations under federal, state and local law; previously filed complaints against the City for its discriminatory practices in regards to transporting persons arrested and in custody have further put the City on notice of its failures to meet those obligations.  Yet, the City has not remedied its ongoing pattern and practice of discrimination during investigation, arrest, booking and detainment.  In addition, facilities at the precinct, Central Booking and Criminal Courthouse were inadequate, particularly in the cell areas and their related bathrooms.

80.    On information and belief, the City of New York routinely fails to provide appropriate and accessible vehicles when a person who uses as wheelchair is arrested, detained or transported by NYPD personnel and/or DHS Police personnel.  On information and belief, there have been multiple lawsuits brought against the City for failure to provide wheelchair accessible vans for the transporting of persons in police custody.

81.    On information and belief, the City is operating in violation of a stipulation of settlement agreed to in *Robert Filer v. The City of New York*, et.al, 1:14-cv-05672 (E.D.N.Y.), which required the City to develop a plan to deal with wheelchair accessibility in law enforcement custodial situations, such as the one involving Ms. McMillan.

82.    On information and belief, the City also fails to offer adequate training on policies or procedures to govern situations where a person who uses a wheelchair is arrested and needs to be transported and fails to require compliance with and fully implement written policies that it maintains or were required to develop and guidelines promulgated by the U.S. Department of Justice.

83.    With deliberate indifference to the rights of citizens to be free from discrimination in law enforcement, the City and its agents, DHS, DHS Police and NYPD, have encouraged, tolerated, ratified, and acquiesced to discrimination by: failing to conduct sufficient training or supervision with respect to the rights of citizens to be free from discrimination in law enforcement and homeless services; by failing to adequately punish disability-based discrimination; by tolerating discrimination among the police force and in police decisions.

84.    It is the longstanding, widespread, deliberately indifferent custom, habit, practice and/or policy of the City of New York to permit its agents and agencies to use disability as a motivating factor in decisions and other actions, as well as to fail to supervise and to train its agents regarding the rights of citizens to be free from such disability discrimination in the provision of municipal services.

85.    The City and its agencies knew or should have known of their obligations under the ADA, Section 504, the NYHRL, and the NYCHRL to provide accommodations to individuals with disabilities, including individuals who are mobility-challenged, and to develop policies to promote compliance with these statutes.

86.    The City and its agencies knew or should have known that its actions and/or inactions created an unreasonable risk of causing Ms. McMillan being injured in transport using non-handicap accessible vehicles and to suffer greater levels of fear, anxiety, indignity, humiliation, and/or emotional distress than a non-disabled, fully-mobile person would be expected to experience.

87.    As a result of the wrongful conduct of Defendants, Ms. McMillan repeatedly experienced discrimination, pain, indignity, inaccessibility and services that were not adequate to accommodate, protect, or ensure the safety of a person who uses a wheelchair.   Moreover, Ms.

McMillan continues to experience negative physical, emotional and mental consequences of such wrongful conduct.

88.     As a result of the City of New York's failure to provide appropriate handicap accessible transportation for Ms. McMillan, she received services that were objectively substandard and that were inferior to those provided to persons who are not so disabled, and she was subjected to discriminatory treatment because of her disabilities.

89.     As a result of the actions and/or inactions of the City and its agencies and its employees and agents, Ms. McMillan was denied the same opportunities that are readily and routinely provided to persons who do not have similar disabilities to be transported with dignity.

90.     The City and its agencies wrongful and intentional discrimination against Ms. McMillan on the basis of disability is reflected by such defendants' failure to train employees and agents and promulgate policies of non-discrimination against persons with disabilities of the kind and nature that Ms. McMillan has, including her seizure disorder, her mental health conditions including depression and PTSD, and her mobility disability.

91.     Ms. McMillan, as a resident of New York City living within the shelter-system operated by DHS, expects to have future encounters with DHS and DHS Police officers, who are employed to provide so-called security within the homeless shelters (and are sometimes referred to as "peace officers"), whether by choice or necessity.

92.     Indeed, according to the website for DHS, the "peace officers" promote security within DHS facilities. "Living by the motto 'police with compassion,' DHS Peace Officers must pledge to maintain the public peace, value human life, respect each individual and render services with courtesy, pride and civility, while displaying the highest standard of integrity."  Unfortunately, the DHS Police officers involved in the incidents described herein missed the mark entirely with respect to their treatment of Ms. McMillan.

93.    Indeed, Officer Surles called Ms. McMillan "retarded" which is also inappropriate, offensive, hurtful and violative of Ms. McMillan's rights.  She is diagnosed with some mental disabilities, including learning disabilities; while she once was diagnosed with mental retardation, that may have been a misdiagnosis.  Even if Ms. McMillan were mentally retarded, no DHS Police officer or NYPD officer would have the right to call her names, laugh at her and ridicule her for her such disabilities.

94.    Ms. McMillan, as a resident of New York City expects to have future encounters with NYPD officers, whether by choice or necessity.

95.    Ms. McMillan is deterred from seeking the aid or protection of DHS, the DHS Police officers and the NYPD due to the discrimination she expects to face if she does so.

96.    Defendants intentionally discriminated against Ms. McMillan and acted with deliberate indifference to her special needs due to her multiple disabilities, causing her to endure additional seizures, physical injury, humiliation, shame, fear, anxiety, and emotional distress.

97.    Ms. McMillan did not see a lawyer until August 20, 2019, when she was scheduled for arraignment.  She was provided court-appointed counsel, but was not given a lot of time to confer with her attorney prior to the arraignment.  To her recollection, she was not able to see a judge until the very end of the arraignment period (a shift which normally ends at 1:00 a.m.) at approximately 12:45 a.m. on August 21, 2019.  Ms. McMillan was released on her own recognizance after being arraigned on several charges, the highest one being a misdemeanor.  She was never charged with assaulting a police officer or resisting arrest.

98.    Due to the time of day, Ms. McMillan had no easy way to get back to the Shelter. Unable to get a timely Access-a-ride, which was her preferred means of transportation, she wheeled away in her broken wheelchair to catch a New York City bus and returned to the Shelter around 3:00 a.m. on August 21, 2019.

99.   Ms. McMillan had been in police custody for approximately 25 hours.   She was unlawfully detained.

100.   On information and belief, while Ms. McMillan was unlawfully detained, her locker and bed-area at the Shelter were searched.   When she returned to the Shelter, some of the items that she had had in her room and under her bed – including 3 pairs of her shoes – were missing.   The value of those shoes was approximately $150.00.

101.   On information and belief, the charges levied against Ms. McMillan were trumped-up in order to attempt to justify the brutal beating inflicted upon her by Officer Surles and the mistreatment she experienced throughout this process of arrest, booking, detention and arraignment.

102.   The prosecutor never served upon her counsel any supporting depositions, which were required to convert the allegations against her.   Ms. McMillan had to appear multiple times in criminal court before her case was ultimately dismissed on November 25, 2019.

103.   Even at the Shelter, when Ms. McMillan returned, she overheard DHS officers say, "I heard he snapped on her."   Ms. McMillan overheard them joking about it; they were laughing.   Ms. McMillan was further traumatized, humiliated and shamed by being made the brunt of the DHS Police officers making jokes about her.

104.   On information and belief, Officer Surles was transferred to another shelter.   On information and belief, Officer Surles had a history of abusing residents within the shelter system and yet he has been allowed to continue working in the system.

105.   Ms. McMillan has received medical attention since the visit to the hospital the EMTs took her to in Brooklyn on August 20, 2019.   She had an examination of her neck, back, wrists and ankles.   She was given a referral for physical therapy for her ankle.

106.   The handcuffs on her ankles were very damaging to her left ankle and have made it more difficult for her to stand and walk.   Notably, this was an upsetting set-back for her, as she was

already being treated by a physical therapist to improve her walking and balance due to an injury that Ms. McMillan suffered from an Access-a-Ride accident.  This was an additional prescription which expanded her treatment protocol.  She has also complained of increased back pain due to Officer Surles kneeing her in the back.

107.  Stress is one of the triggers for Ms. McMillan's seizures and the events in question were experienced by Ms. McMillan as highly stressful.  She has had additional seizures since that time and has received additional treatment therefor.  She attributes the additional stress to her fear, anxiety, depression and worry that has resulted from the traumatic events that occurred from August 19th through August 21st, 2019 described herein.

108.  When she looks at her wrists (her right wrist is still experiencing some swelling), and when she looks at her ankle – especially while at physical therapy and when she experiences pain – she has flash-backs of the events.  She also has some scarring from the tight cuffs.  She emotionally beats herself up for being victimized at the hands of the DHS Police officers and/or NYPD officers.

109.  Within a month of the events described herein, Ms. McMillan dropped approximately 30 pounds from not eating due to stress.  She was not on a diet to lose weight.  Ms. McMillan had appetite issues for some time that she attributed to her increased symptoms of depression and PTSD; as she began to put weight back on, she reports self-medicating with food and reports gaining back even more weight than she lost after these traumatizing events.

110.  She was living in fear when she had to return to that Shelter.  With all the triggers there, she asked to be relocated to another shelter.  As of the date of this filing of the Complaint, she is in a shelter located in Long Island City, in Queens County, State of New York, but because there are DHS officers installed there for "security reasons", she remains fearful.

111.  Ms. McMillan has emotional and psychological problems associated with prior abuse, including depression and PTSD.  She believes the events described in this Complaint have

traumatized her and that her emotional and psychological conditions have also exacerbated by the experiences described in this Complaint.

112.   Ms. McMillan receives evaluations for services within the shelter system and is awaiting permanent housing, which document some of her issues.

113.   Although Ms. McMillan has had difficulty accepting her need for ongoing therapy and counseling due to negative experiences in the past, she recognizes that she will have a better chance of dealing with her traumas, if she seeks counseling.  She has plans to see a therapist.

114.   Plaintiff was deprived of her liberty; suffered emotional distress and mental anguish; was unlawfully strip searched; suffered fear, pain, bodily injury, anxiety, embarrassment and humiliation; and was deprived of her important rights under federal, state and local laws.


### FIRST CLAIM
**Unlawful Stop, Search and Seizure**

115.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

116.   Defendants violated the Fourth and Fourteenth Amendments of the U.S. Constitution because they unlawfully stopped, searched and seized plaintiff without reasonable suspicion.

117.   As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.


### SECOND CLAIM
**False Arrest and Failure to
Give Miranda Warnings**

118.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

119.   Defendants violated the Fourth, Fifth and Fourteenth Amendments of the U.S. Constitution because they arrested plaintiff without probable cause.

120.   As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

### THIRD CLAIM
**State Law False Imprisonment and False Arrest**

121.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

122.   By their conduct, as described herein, the individual defendants are liable to plaintiff for falsely imprisoning and falsely arresting plaintiff.

123.   Plaintiff was conscious of her confinement. Plaintiff did not consent to her confinement. Plaintiff's confinement was not otherwise privileged.

124.   Defendant City of New York, as an employer of the individual defendant officers, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

125.   As a direct and proximate result of the misconduct and abuse of authority stated above, plaintiff sustained the damages alleged herein.

### FOURTH CLAIM
**Malicious Prosecution**

126.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

127.   By their conduct, as described herein, and acting under color of state law, defendants are liable to plaintiff under 42 U.S.C. § 1983 for the violation of her constitutional right to be free from malicious prosecution under the Fourth and Fourteenth Amendments to the United States Constitution.

128.   Defendants' unlawful actions were done willfully, knowingly, with malice and with the specific intent to deprive plaintiff of her constitutional rights.  The prosecution by defendants of plaintiff constituted malicious prosecution in that there was no basis for the plaintiff's arrest; yet defendants continued with the prosecution, which was resolved in plaintiff's favor.

129.   As a direct and proximate result of defendants' unlawful actions, plaintiff has suffered, and will continue to suffer, damages, including physical, mental and emotional injury and pain, mental anguish, suffering, humiliation, embarrassment and loss of reputation.

## FIFTH CLAIM
### State Law Malicious Prosecution

130.  Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

131.  By their conduct, as described herein, defendants are liable to plaintiff for having committed malicious prosecution under the laws of the State of New York.

132.  Defendants maliciously commenced a criminal proceeding against plaintiff, charging her with, *inter alia*, violations of New York Penal Law Sections 195.05 (obstructing governmental administration in the second degree), 220.03 (criminal possession of a controlled substance in the seventh degree) and 240.26(1) (harassment in the second degree) (2 counts).  Defendants falsely and without probable cause charged plaintiff with violations of the laws of the State of New York.

133.  The commencement and continuation of the criminal proceedings against plaintiff was malicious and without probable cause. Ultimately, all charges were terminated in plaintiff's favor.

134.  Defendants, their officers, agents, servants and employees were responsible for the malicious prosecution of plaintiff.  Defendant City of New York, as an employer of the individual defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

135.  As a direct and proximate result of the misconduct and abuse of authority stated above, plaintiff sustained the damages alleged herein.

## SIXTH CLAIM
### Unreasonable Force

136.  Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

137.  The defendants violated the Fourth and Fourteenth Amendments because they used unreasonable force on plaintiff.

138.   As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## SEVENTH CLAIM
### State Law Assault and Battery

139.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

140.   By their conduct, as described herein, the defendants are liable to plaintiff for having assaulted and battered her.

141.   Defendant City of New York and its agencies, as employer of the individual defendant officers, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

142.   As a direct and proximate result of the misconduct and abuse of authority stated above, plaintiff sustained the damages alleged herein.

## EIGHTH CLAIM
### Negligent Hiring, Training and Retention

143.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

144.   Defendant City, through DHS, DHS Police and NYPD, owed a duty of care to plaintiff to prevent the conduct alleged, because under the same or similar circumstances, a reasonable, prudent, and careful person should have anticipated that injury to plaintiff or to those in a like situation would probably result from the foregoing conduct.

145.   Upon information and belief, all of the individual defendants were unfit and incompetent for their positions.

146.   Upon information and belief, defendant City and its agencies knew or should have known through the exercise of reasonable diligence that the individual defendants were potentially dangerous.

147.   Upon information and belief, defendant City's and its agencies' negligence in screening, hiring, training, disciplining, and retaining these individual defendants proximately caused each of plaintiff's injuries.

148.   As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## NINTH CLAIM
### Negligence (Property Damage)

149.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

150.   Plaintiff's owned personal property, *inter alia*, her fingernails, her flip flops, her wheelchair and the items taken from the shelter in which she then resided, as described above, while she was in custody.  Such person property was valuable to her, given her limited financial means.

151.   Defendants owed a duty to plaintiff to use reasonable care in respect of her property.

152.   Defendants breached the duty of care, when they negligently damaged, lost or failed to preserve plaintiff's property.

153.   Such negligence was the actual and proximate cause of plaintiff's damages in respect of the lost or damaged property.  Plaintiff suffered property damage for the value of the items so lost or damaged.

## TENTH CLAIM
### Negligent Infliction of Emotional Distress

154.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

155.   By reason of the foregoing, and by assaulting, battering, and using gratuitous, excessive, brutal, sadistic, and unconscionable force, failing to prevent other defendants from doing so, or causing an unlawful seizure and extended detention without due process, the defendants, acting in their capacities as DHS Police officers and/or NYPD officers, and within the

scope of their employment, each were negligent in committing conduct that inflicted emotional distress upon plaintiff.

156.   The negligent infliction of emotional distress by these defendants was unnecessary and unwarranted in the performance of their duties as DHS Police officers and/or NYPD officers.

157.   The City and its agencies and each of their respective officers, agents, servants, and employees were responsible for the negligent infliction of emotional distress upon plaintiff. Defendant City of New York and its agencies, as employer of each of the individual defendants, is responsible for their wrongdoings under the doctrine of *respondeat superior*.

158.   As a direct and proximate result of the misconduct and abuse of authority detailed above, plaintiff sustained the damages hereinbefore alleged.

### ELEVENTH CLAIM
### Intentional Infliction of Emotional Distress

159.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

160.   By reason of the foregoing, and by assaulting, battering, and using gratuitous, excessive, brutal, sadistic, and unconscionable force, failing to prevent other defendants from doing so, or causing an unlawful seizure and extended detention without due process, the defendants, acting in their capacities as DHS Police officers and/or NYPD officers, and within the scope of their employment, each committed conduct so extreme and outrageous as to constitute the intentional infliction of emotional distress upon plaintiff.

161.   The intentional infliction of emotional distress by these defendants was unnecessary and unwarranted in the performance of their duties as DHS Police officers and/or NYPD officers.

162.   The City and its agencies and each of their respective officers, agents, servants, and employees were responsible for the intentional infliction of emotional distress upon plaintiff. Defendant City of New York and its agencies, as employer of each of the individual defendants, is responsible for their wrongdoings under the doctrine of *respondeat superior*.

163.   As a direct and proximate result of the misconduct and abuse of authority detailed above, plaintiff sustained the damages hereinbefore alleged.

## TWELFTH CLAIM
### Failure To Intervene

164.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

165.   Those defendants that were present but did not actively participate in the aforementioned unlawful conduct observed such conduct, had an opportunity prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

166.   Accordingly, the defendants who failed to intervene violated the Fourth, Fifth and Fourteenth Amendments of the U.S. Constitution.

167.   As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged including physical injury, loss of liberty, fear, anxiety, humiliation, shame and emotional distress.

## THIRTEENTH CLAIM
### Americans with Disabilities Act Violations Against the City of New York

168.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

169.   At all times relevant to this action, Title II of the ADA, 42 U.S.C. §§ 12131 et seq., has been in full force and effect and has applied to the City's conduct.

170.   At all times relevant to this action, the United States Department of Justice regulations implementing Title II of the ADA, 28 C.F.R. Part 35, have been in full force and effect and have applied to the City's conduct.

171.   At all times relevant to this action, Ms. McMillan has been substantially limited in the major life activities of being able to hold a job and earn enough money to avoid being homeless due to her seizure disorder and other mental and emotional disabilities, as well as in the area of mobility,

being reliant on a wheelchair due to her physical disabilities, and is considered an individual with a disability as defined in the ADA, 42 U.S.C. § 12102(2).

172.   Defendant City, by and through the NYPD, DHS, and DHS Police, is a public entity as defined under Title II of the ADA, 42 U.S.C. § 12131(1).

173.   The City of New York, by and through its agencies, is vicariously liable for the actions of its employees and agents under a theory of *respondeat superior*, and is directly liable for its failure to train employees and agents and its failure to implement or modify policies to ensure compliance with the ADA.

174.   Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

175.   Federal Regulations implementing Title II of the ADA state that a public entity may not "(i) deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service; (ii) afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; [or] (iii) provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others."  28 C.F.R. § 35.130(b)(1).

176.   Defendant discriminated against Ms. McMillan on the basis of disability by excluding her from participation in and denying her the benefits of its services, and by subjecting her to discrimination, in violation of the ADA.

177.   Defendant's failure to provide Ms. McMillan with handicap accessible transportation during the arrest to arraignment process described in this Complaint, as well as handicap accessible

toilet facilities in the precinct, Central Booking and courthouse, denied her the same access to Defendant's services, benefits, activities, programs, or privileges as the access provided to non-disabled individuals.

178. Defendant City of New York, by and through NYPD, DHS and DHS Police, further discriminated against Ms. McMillan by failing to train its officers to accommodate disabled individuals and failing to modify discriminatory practices and procedures, as required by the ADA.

179. Defendant City's and its agencies' violation of Plaintiff's rights under the ADA caused Plaintiff to suffer from discrimination, unequal treatment, and exclusion.

180. Plaintiff is therefore entitled to compensatory damages for the injuries and loss sustained as a result of such Defendants' deliberate indifference as hereinbefore alleged, as well as an award of attorney's fees, costs, and disbursements, pursuant to the ADA, 42 U.S.C. § 12133.

## FOURTEENTH CLAIM
### Rehabilitation Act Violations Against the City of New York

181. Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

182. At all times relevant to this action, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, has been in full force and effect and has applied to the Defendant City of New York's and its agencies' conduct.

183. At all times relevant to this action, Ms. McMillan has had substantial impairment to the major life activities of being able to hold a job and earn enough money to avoid being homeless due to her seizure disorder and other mental and emotional disabilities, as well as in the area of mobility, being reliant on a wheelchair due to her physical disabilities, and is considered disabled within the meaning of 45 C.F.R. § 84.3(j), and accordingly, she is individual with a disability as defined under 29 U.S.C. § 708(20)(B).

184. Pursuant to Section 504 of the Rehabilitation Act, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation

in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

185.   Defendant City of New York and its agencies discriminated against Ms. McMillan on the basis of disability by excluding her from participation in and denying her the benefits of its services, and by subjecting her to discrimination, in violation of Section 504 of the Rehabilitation Act.

186.   Defendant City of New York's and its agencies' failure to provide Ms. McMillan with handicap accessible transportation during the arrest to arraignment process described in this Complaint, as well as handicap accessible toilet facilities in the precinct, Central Booking and courthouse, denied her the same access to Defendant's services, benefits, activities, programs, or privileges as the access provided to non-disabled individuals.

187.   Defendant City of New York, by and through the NYPD, DHS and DHS Police, further discriminated against Ms. McMillan by failing to train its officers to accommodate disabled individuals and failing to modify discriminatory practices and procedures, as required by the Rehabilitation Act.

188.   Plaintiff is therefore entitled to seek and recover compensatory damages for the injuries and loss sustained as a result of such Defendants' discriminatory conduct as hereinbefore alleged, as well as an award of attorney's fees, costs, and disbursements, pursuant to the Rehabilitation Act, 29 U.S.C. § 794.

**FIFTEENTH CLAIM**
**New York Human Rights Law Violations Against the City of New York**

189.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

190.   At all times relevant to this action, the New York Human Rights Law,  N.Y. Exec. L. § 290, et seq., has been in full force and effect and has applied to Defendant's City's and its agencies' conduct and to the supervisors of such persons.  To the extent that one or more of the persons

identified herein may be supervisors, including, but not limited to, Officer Surles, such persons would also be liable.

191.  At all times relevant to this action, Ms. McMillan has had substantial impairments to the major life activities of being able to hold a job and earn enough money to avoid being homeless due to her seizure disorder and other mental and emotional disabilities, as well as in the area of mobility, being reliant on a wheelchair due to her physical disabilities, and therefore has been a qualified person with a disability within the meaning of the NYHRL, N.Y. Exec. L. § 292(21).

192.  At all times relevant to this action, Defendant City's and its agencies' facilities have been places of public accommodation within the meaning of N.Y. Exec. L. § 292(9).

193.  Pursuant to N.Y. Exec. L. § 296(2)(a), it shall be unlawful discrimination "for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, resort or amusement, because of the . . . disability . . . of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof."

194.  Pursuant to N.Y. Exec. L. § 296(2)(c), discrimination includes "refusal to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford facilities, privileges, advantages or accommodations to individuals with disabilities."

195.  Plaintiff is an aggrieved person within the meaning of N.Y. Exec. L. § 297(9), which extends a cause of action and relief to "any person claiming to be aggrieved" by the discrimination of a person on the basis of his or her disability.

196.  Defendant City, its agencies and individual defendants who are supervisors of other officers, discriminated against Ms. McMillan on the basis of her disability by withholding the accommodations, advantages, facilities or privileges of Defendant's services, in violation of N.Y.

Exec. L. § 296(2)(a), and by failing to accommodate plaintiff's multiple disabilities in violation of N.Y. Exec. L. § 296(2)(c).

197.   The failure of Defendant City and its agencies, and any involved supervisors (including, but not limited to, Officer Surles) to provide Ms. McMillan with handicap accessible transportation during the arrest to arraignment process described in this Complaint, as well as handicap accessible toilet facilities in the precinct, Central Booking and courthouse, denied her the same access to Defendant City's and its agencies' services, benefits, activities, programs, or privileges as the access provided to non-disabled individuals.

198.   Defendant City of New York, by and through the DHS, DHS Police and NYPD, further discriminated against Ms. McMillan by failing to train its officers to accommodate disabled individuals and failing to modify discriminatory practices and procedures, as required by the NYHRL.

199.   Defendants who are identified herein and who are supervisors of any of the individual defendants, including, but not limited to, Officer Surles, who on information and belief, is a supervisor of one or more of the officers identified herein, discriminated against Ms. McMillan by failing to train the officers such persons were supervising to accommodate disabled individuals and failing to modify discriminatory practices and procedures, as required by the NYHRL.

200.   Plaintiff is therefore entitled to seek and recover compensatory damages for the injuries and loss sustained as a result of Defendants' discriminatory conduct as hereinbefore alleged, pursuant to N.Y. Exec. L. § 297(9).

## SIXTEENTH CLAIM
**New York Human Rights Law Violations Against the City of New York**

201.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

202.   At all times relevant to this action, the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101, et seq., has been in full force and effect and has applied to Defendant City's and its agencies' conduct.

203.   At all times relevant to this action, Ms. McMillan has had substantial impairments to the major life activities of being able to hold a job and earn enough money to avoid being homeless due to her seizure disorder and other mental and emotional disabilities, as well as in the area of mobility, being reliant on a wheelchair, and therefore has been a person with a disability within the meaning of N.Y.C. Admin. Code § 8-102(16).

204.   At all times relevant to this action, Defendant City and its agencies have been a "covered entity" as defined in N.Y.C. Admin. Code §§ 8-102(1), (17).

205.   Pursuant to N.Y.C. Admin. Code § 8-107(4), it shall be unlawful discrimination for "any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation because of . . . disability . . . of any person directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof."

206.   Pursuant to N.Y.C. Admin. Code § 8-107(15)(a), a covered entity "shall make reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity."

207.   Plaintiff is an aggrieved person within the meaning of N.Y.C. Admin. Code § 8-502(a), which extends a cause of action and relief to "any person claiming to be aggrieved" by the discrimination of a person on the basis of his or her disability.

208.   Defendant City and its agencies discriminated against Ms. McMillan on the basis of disability by withholding the accommodations, advantages, facilities or privileges of Defendant's

services, in violation of N.Y.C. Admin. Code § 8-107(4), and by failing to accommodate her disability in violation of N.Y.C. Admin. Code § 8-107(15)(a).

209.   Defendants' failure to provide Ms. McMillan with handicap accessible transportation during the arrest to arraignment process described in this Complaint, as well as handicap accessible toilet facilities in the precinct, Central Booking and courthouse, denied her the same access to Defendant's services, benefits, activities, programs, or privileges as the access provided to non-disabled individuals.

210.   Defendant, through DHS, DHS Police and NYPD, further discriminated against Ms. McMillan by failing to train its officers to accommodate disabled individuals and failing to modify discriminatory practices and procedures, as required by the NYCHRL.

211.   Plaintiff is therefore entitled to seek and recover compensatory damages for the injuries and loss sustained as a result of the City's and its agencies' discriminatory conduct as hereinbefore alleged, pursuant to N.Y.C. Admin. Code § 8-502(a).

212.   Defendants consciously disregarded the rights of Ms. McMillan.   Defendants' recklessness and/or willful and/or wanton negligence were the direct and proximate cause of Ms. McMillan's injuries.  Accordingly, plaintiff is entitled to seek and recover punitive damages for the injuries and loss she sustained as a result of the City's and its agencies' discriminatory conduct.

213.   Plaintiff is further entitled to an award of attorney's fees, costs, and disbursements pursuant to N.Y.C. Admin. Code § 8-502(g).

## SEVENTEENTH CLAIM
### Deprivation of Federal Civil Rights under the United
### States Constitution and 42 U.S.C. § 1983 Against All Individual Defendants

214.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

215.   This claim for relief is brought against each and every individual Defendant.   Such individual Defendants were, at all times relevant hereto, employees of DHS, DHS Police and/or

NYPD.  Furthermore, all of the individual Defendants' conduct throughout Ms. McMillan's 25-hour arrest, transport, and detention was performed under the color of New York state law.

216.   By their conduct and actions in unlawfully detaining, searching, arresting, imprisoning plaintiff, and in fabricating evidence against plaintiff, and in failing to intercede on behalf of plaintiff and protect her from the unjustified and unconstitutional treatment she received at the hands of officers acting with animus, and under color of law and without lawful justification, defendants intentionally, maliciously, and with deliberate indifference to or a reckless disregard for the natural and probable consequences of their acts, caused injury and damage in violation of the plaintiff's constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its Fourth, Fifth and Fourteenth Amendments.

217.   As a result of the foregoing, plaintiff was deprived of her liberty, suffered emotional distress, great anxiety and humiliation, pain, physical injury, fear and damage to her reputation, and was otherwise damaged and injured.

218.   Furthermore, Ms. McMillan's visible physical disability constitutes a serious medical condition, and her wheelchair is a medical necessity.

219.   The individual defendants knew of and disregarded Ms. McMillan's visible physical disability, as well as her seizure disorder which was, on information and belief, known to them or should have been known to them, and the corresponding excessive risks to Ms. McMillan's health and safety by arresting, transporting and detaining her in an inaccessible and dangerous manner that did not accommodate her disability, failed to protect her, and threatened her serious harm.

220.   The individual Defendants were deliberately indifferent to Ms. McMillan's serious medical conditions and disabilities during the dangerous and inaccessible arrest, transport and detention by DHS, DHS Police and/or NYPD as alleged herein.

221.  By their conduct alleged in this Complaint, the individual defendants deprived Ms. McMillan of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution, the ADA, and other federal laws.

222.  The individual defendants' conduct manifested deliberate indifference, or reckless disregard of, Ms. McMillan's constitutional and federal rights.

223.  The individual defendants acted in concert to deprive Ms. McMillan of her constitutional and federal rights.

224.  Accordingly, Ms. McMillan was harmed as a direct result of the individual Defendants' unlawful, unconstitutional and discriminatory conduct, and is entitled to damages, injunctive relief, and reasonable attorneys' fees and costs in an amount to be determined by the Court.

### EIGHTEENTH CLAIM
**Deprivation of Federal Civil Rights under the United
States Constitution and 42 U.S.C. §1983 Against Defendant City of New York**

225.  Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

226.  On information and belief, Defendant City of New York (and its agencies: DHS, DHS Police and NYPD) have inadequate written policies and/or fail to implement its policies concerning how its employees transport people who have seizure disorders and use wheelchairs.

227.  It is highly predictable that DHS, DHS Police and NYPD personnel would encounter and transport people who have seizure disorders and use wheelchairs in New York City. Consequently, Defendant City of New York and its agencies knew to a moral certainty that DHS, DHS Police and NYPD personnel would encounter and transport people who have seizure disorders and use wheelchairs.

228.  On information and belief, the City of New York, DHS, DHS Police and NYPD have notice of numerous complaints in which persons acting under color of state law employed by and

through agencies of the City of New York allegedly violated the rights of people who have seizure disorders and use wheelchairs during transport.

229.   On information and belief, the City of New York, DHS, DHS Police and NYPD know that the policies and methods of DHS, DHS Police and NYPD for transporting people who have seizure disorders and use wheelchairs are insufficient because there is a history of DHS, DHS Police and NYPD officers having difficulty, mishandling, and failing to accommodate people who use wheelchairs during transport.   The City of New York, DHS, DHS Police and NYPD have consequently long been aware that the failures of their employees would result, and will continue to result, in the deprivation of individuals wheelchair users' and persons with seizure disorders' constitutional and federal rights.

230.   The City of New York's, DHS', DHS Police's and NYPD's deliberate choice to ignore the known problems with DHS Police and NYPD officers providing transport to people who use wheelchairs and have seizure disorders, and the City of New York's, DHS', DHS' Police's and NYPD's failure to implement and/or enforce an adequate policy or practice to guide the officers in DHS Police and NYPD concerning how to transport arrestees who use wheelchairs and have seizure disorders resulted in the violation of Ms. McMillan's rights secured by the Fourth and Fourteenth Amendments and the ADA.   The City's, DHS', DHS Police's and NYPD's customs and practices for transporting people who use wheelchairs are discriminatory and dangerous.

231.   The City of New York, DHS, DHS Police and NYPD also failed to adequately train, monitor and supervise its employees regarding their constitutional and federal duty, despite DHS', DHS Police's and NYPD's history of encounters with people who use wheelchairs and have seizure disorders and the predictability that DHS Police and NYPD personnel would continue to encounter and transport people who use wheelchairs and have seizure disorders in New York City.

232.   By permitting, tolerating and sanctioning a persistent and widespread policy, practice and custom pursuant to which Ms. McMillan was subjected to the conduct alleged herein, Defendant City of New York and its agencies have deprived Ms. McMillan of rights, remedies, privileges and immunities guaranteed to every citizen of the United States secured by 42 U.S.C. § 1983, including but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution, the ADA, and other federal laws.

233.   Accordingly, Ms. McMillan was harmed as a direct result of Defendants' unlawful, unconstitutional and discriminatory conduct, and is entitled to damages, injunctive relief, and reasonable attorneys' fees and costs in an amount to be determined by the Court.

## NINETEENTH CLAIM
### Liability for New York State Constitutional Violations

234.    Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

235.   By reason of the foregoing, and by arresting, detaining and imprisoning plaintiff without probable cause or reasonable suspicion, harassing and assaulting her and depriving her of due process and equal protection of laws and subjecting her to discrimination on the basis of her disabilities, defendant police officers deprived plaintiff of rights, remedies, privileges and immunities guaranteed to every New Yorker by Article I §5 (prohibiting cruel and unusual punishments), Article I §6 (providing for due process), Article I §11 (prohibiting discrimination in civil rights and providing for equal protection of laws) and Article I §12 (prohibiting unreasonable searches and seizures) of the New York State Constitution.

236.   In addition, defendant officers conspired among themselves and with other individuals to deprive plaintiff of her rights secured under Article I §§ 5, 6, 11 and 12 of the New York State Constitution and took numerous overt steps in furtherance of such conspiracy, as set forth above.

237.   Defendant officers acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employments as officers, agents or employees of the City of New York, DHS, DHS Police and NYPD.  Defendant officers' acts were beyond the scope of their jurisdiction, without any authority of law, and were in abuse of their powers.  Defendant officers acted willfully, knowingly, and with the specific intent to deprive plaintiff of their rights as secured by Article I §§ 5, 6, 11 and 12 of the New York State Constitution.

238.   Defendants were responsible for the deprivation of plaintiff's state constitutional rights causing significant damage to plaintiff as set forth herein.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, plaintiff respectfully requests judgment against defendants as follows:

(a)     Enter a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that the City's policies, procedures, and practices have subjected plaintiff to unlawful discrimination in violation of Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, the New York Human Rights Law, and the New York City Human Rights Law;

(b)     Enjoin the City from implementing or enforcing any policy, procedure, or practice that denies persons with seizure disorders and who are wheelchair bound meaningful access to and full and equal enjoyment of Defendant's facilities, services or programs;

(c)     Order the City of New York, and to the extent appropriate and permissible, the NYPD, DHS and DHS Police:

    i.     to develop, implement, promulgate, and comply with a policy prohibiting future discrimination against plaintiff and similarly

situated individuals by failing to provide adequate protections in the arrest and transport of such persons;

ii.    to develop, implement, promulgate, and comply with a policy requiring that, when such persons are arrested, Defendant will evaluate the individual's need for an accommodation;

iii.    to develop, implement, promulgate, and comply with a policy requiring that the City and its agencies will assess and then provide the appropriate accommodations to persons suffering from seizure disorders and who are in wheelchairs during an investigation, emergency response, and/or arrest;

iv.    to develop, implement, promulgate, and comply with a policy requiring the City and its agencies to provide handicap accessible vans or other means and methods of transportation for the transportation of those in wheelchairs and to provide facilities inside the City's police precincts, Central Booking and courthouses to fully participate in and benefit from the programs and services offered by these public entities; and

v.    to train all its employees, staff, and other agents on a regular basis about the rights of individuals who have seizure disorders and are wheelchair bound under the ADA, Section 504 of the Rehabilitation Act, the New York Human Rights Law, and the New York City Human Rights Law;

(d)    Compensatory damages against all defendants, jointly and severally, in an amount no less than one million dollars ($1,000,000.00);

(e)        Punitive damages against all defendants, jointly and severally, in an amount no less than five million dollars ($5,000,000.00), except where so limited by applicable law;

(f)        Reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988, the ADA, Section 504 of the Rehabilitation Act, and the New York City Human Rights Law;

(g)        Interest on all amounts at the highest rates and from the earliest dates allowed by law; and

(h)        Such other and further relief as this Court deems just and proper.

Dated:  New York, New York
        November 16, 2020

THE CAMPBELL FIRM PLLC

By: /s/ Emily Campbell

_____

Emily Campbell (EC7702)
349 Fifth Avenue
New York, New York 10016
(212) 267-3600 Phone
(212) 267-3601 Fax
ecampbell@campbellfirm.com
**Attorneys for Plaintiff**